PER CURIAM.
L.E.O. and P.O. (“the petitioners”) filed a petition in the Madison Juvenile Court (“the juvenile court”) seeking the custody of J.I.P., Jr., a now seven-year-old boy who has been living with them for several years (“the child”), and alleging that the child is a dependent child. The child’s parents are J.I.P. .(“the father”) and A.L. (“the mother”). The petitioners are not related to the child; he lives with them with the consent of the mother. After a proceeding at which it heard ore tenus evidence, the juvenile court held that the child was not dependent and dismissed the petition for lack of jurisdiction. The petitioners appealed. The Court of Civil Appeals affirmed the juvenile court’s decision without an opinion; Judge Bryan dissented, with an opinion. We granted certiorari review to consider whether the Court of Civil Appeals’ judgment conflicted with applicable caselaw. We conclude that it does, and we reverse the judgment.

I. Factual Background and Procedural History

The father and the mother married in 2002 in Huntsville. At that time, the father was a member of the United States Army and was stationed at Ft. Hood, Texas; the mother moved to Ft. Hood shortly after the marriage. The child was born in June 2003. From November 2003 until January 2004, the mother and the child stayed with the child’s paternal grandmother in California while the father remained at Ft. Hood. The mother and the child returned to Ft. Hood in January 2004, and, when the father was deployed to Iraq in March 2004, the mother and the child returned to Huntsville. The petitioners, whose daughter had attended high school with the mother, began babysitting for the mother, and they befriended her and the child.
The petitioners say that while the father was on leave in October 2004, he took the child to California without the mother’s knowledge and obtained a temporary-custody order there. The father returned to Iraq in November 2004, leaving the child in California with the paternal grandmother. The mother contested the custody proceedings in California and instituted divorce proceedings in the Madison Circuit Court (“the divorce court”). The California court determined that it did not have jurisdiction over the child, and in March 2005 the divorce court awarded custody of *1044 the child to the mother, and he was returned to Alabama. The petitioners paid the mother’s legal bills related to those proceedings.
The father left the Army in August 2005 and returned to California. Also in August 2005, the divorce court held a penden-te lite hearing at which the father appeared. The judge determined that the father had been guilty of domestic violence, ordered him to attend an anger-management program and a parenting class, required that his visitation with the child be supervised until he had completed those classes, and ordered him to pay child support in accordance with the child-support guidelines, Rule 32, Ala. R. Jud. Admin. L.E.O. brought the child to the office of the mother’s attorney on the date of the pendente lite hearing in the divorce court so the father could visit with the child. At the time of the hearing in the juvenile court in December 2008, the father had not seen the child since the visit in 2005, although he had talked to the child on the telephone.
The final hearing in the father and mother’s divorce case was held in June 2006. The father was notified of the hearing, but he did not attend. The final divorce judgment awarded custody of the child to the mother, suspended the father’s visitation rights until he completed a parenting class, and ordered him to attend an anger-management program. The divorce court found that the father had not provided any support for the child or provided the information necessary for calculating a child-support obligation, but the divorce judgment did not contain any requirement that the father pay child support. That judgment was mailed to the father at the paternal grandmother’s residence. The father denied receiving a copy but admitted that he was living with his mother at the address on file with the court when the judgment was entered and that he did not ever contact the court to obtain a copy of the judgment.
In the meantime, the petitioners’ involvement with the child increased. The child progressed from occasionally spending the weekend with the petitioners to living with them on an ongoing basis. The petitioners provided for all the child’s needs without financial support from either the mother or the father. In August 2007, the petitioners filed a petition in the juvenile court seeking custody of the child in which they alleged that he was dependent. The mother filed an answer admitting the allegations of the petition and consenting to the petitioners’ obtaining custody of the child. She did not appear at any subsequent hearings in the juvenile court. In August 2008 the father was added as a party to the juvenile court proceedings, and it was ordered that he be served.
The petitioners contend that the father knew they were involved in the child’s life in August 2005 when L.E.O. brought the child to visit with the father in the mother’s attorney’s office. The mother had told him that the petitioners were like grandparents to the child, but the father says that neither the mother nor the petitioners ever told him that the mother had allowed the child to begin living with the petitioners. Approximately three years before the final hearing in the juvenile court, the father telephoned P.O. to inquire about the child. The petitioners say that P.O. “offered to serve as a conduit for information and a receptacle for any gifts or support that the father [might] want to send” but that he never contacted her again. The father denies that P.O. made any such offer. The petitioners say they have had the same address and telephone numbers since the child began living with them. The father says he has also had the same *1045 address and telephone number since. be left the Army and returned to California.
In August 2008, L.E.O. telephoned the father and left a message for him. The paternal grandmother returned the call, and L.E.O. told her that the child was living with the petitioners and that they had instituted custody proceedings in the juvenile court. In explaining why he had not seen the child from August 2005 until the hearing in the juvenile court in December 2008, the father testified that he had been trying to arrange for visitation through the mother but that she always had an excuse as to why he should not come to Alabama. The father also stated that the mother, the maternal grandmother, and the mother’s friends had threatened him with physical violence if he came to Alabama. The father testified that he had offered to send the mother money for the child but that she would tell him she did not know her complete address. Then, he said, she would never call him back or answer his telephone calls. He said that the mother often changed her address and telephone number, which made it difficult for him to keep in touch with her. The father testified that, after he learned about the custody proceedings initiated in the juvenile court by the petitioners, he saved his money to be able to afford airplane tickets in order that he and the paternal grandmother could attend the hearing.
L.E.O. was 51 years old at the time of the hearing in the juvenile court. He and P.O. had been married for 29 years and have two adult daughters. L.E.O. had been employed as the manager of the service department for an automobile dealership after retiring from his former job as a police officer. He was unemployed at the time of the hearing because the dealership for which he worked had closed, but he anticipated no problems in finding another job in the automobile-service industry. P.O. works as a fifth-grade teacher at the school where the child attended kindergarten. The petitioners take the child to Sunday School and church and consider him a part of their family.
The father was 26 years old at the time of the hearing. He stated that, although he lived with his mother, he paid her rent, he was employed full time, and he attends college. He testified that he had investigated day-care arrangements for the child if they are needed and that he had confirmed that he could add the child to the health-care insurance coverage he receives as a former member of the military. The paternal grandmother testified that numerous family members lived nearby in California who were anxious to provide a support network for the father and the child. Both the father and the paternal grandmother testified that they love the child and want him to be a part of their lives but that the father’s attempts to keep in touch with the child have been continuously thwarted by the mother. They also testified that they had no knowledge that the mother had relinquished custody of the child to the petitioners until the father was served with the summons in this case.
The juvenile court held that the child “is not a dependent child and this court lacks jurisdiction.” The juvenile court dismissed the petition on that basis. The Court of Civil Appeals affirmed the judgment of the juvenile court dismissing the petition, without an opinion. L.E.O. v. A.L., 61 So.3d 1041 (Ala.Civ.App.2009).

II. Analysis

Judge Bryan dissented from the Court of Civil Appeals’ no-opinion affir-mance. His dissent is based on his conclusion that the petitioners demonstrated that the juvenile court “was plainly or palpably wrong in concluding that the child ... was not a dependent child” under Alabama law. *1046 61 So.3d at 1041. Specifically, Judge Bryan concluded that the petitioners had produced substantial evidence showing that the father had abandoned the child. He noted that before the December 2008 hearing in the juvenile court the father had not seen the child since 2005 and that he had not provided any financial support for the child. Judge Bryan states that the father testified that his visitation with the child had been thwarted by the mother and that he had been unaware that the child was living with the petitioners. Judge Bryan then states:
“The father’s abandonment of the child for approximately three years cannot be excused simply because he contends that he was unaware of the child’s circumstances. The fact that he was unaware of who was cai'ing for and providing for his child during that time further convinces me that he had abandoned the child. The evidence produced by [the petitioners] unequivocally shows that the father had ‘with[held] from the child, without good cause or excuse, ... his presence, care, love, protection, maintenance, or the opportunity for the display of filial affection,’ had Tail[ed] to claim the rights of a parent,’ and had ‘fail[ed] to perform the duties of a parent.’ § 26-18-3(1), Ala.Code 1975 (now codified at § 12-15-301(1), Ala.Code 1975), thereby demonstrating that the child was dependent.”
61 So.3d at 1041-42.
A child is dependent if, at the time a petition is filed in the juvenile court alleging dependency, the child meets the statutory definition of a dependent child. When the petition was filed in the present case, the definition of a “dependent child” read as follows:[1]
“A child:
“a. Who, for any reason is destitute, homeless, or dependent on the public for support; or
“b. Who is without a parent or guardian able to provide for the child’s support, training, or education; or
“c. Whose custody is the subject of controversy; or
“d. Whose home, by reason of neglect, cruelty, or depravity on the part of the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
“e. Whose parent, parents, guardian, or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical, or other care necessary for the child’s health or well-being; or
“f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
“g. Who has no proper parental care or guardianship; or
“h. Whose parent, parents, guardian, or custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state; or
“i. Who has been abandoned[2] by the child’s parents, guardian, or other custodian; or
*1047 “j. Who is physically, mentally, or emotionally abused by the child’s parents, guardian, or other custodian or who is without proper parental care and control necessary for the child’s well-being because of the faults or habits of the child’s parents, guardian, or other custodian or their neglect or- refusal, when able to do so, to provide them; or
“k. Whose parents, guardian, or other custodian are unable to discharge their responsibilities to and for the child; or
“l. Who has been placed for care or adoption in violation of the law; or
“m. Who for any other cause is in need of the care and protection of the state; and
“n. In any of the foregoing, is in need of care or supervision.”
§ 12-15-1(10), Ala.Code 1975 (emphasis added) (amended and renumbered as § 12-15-102(8)a., Ala.Code 1975).
A child who falls into one of the categories described in § 12-15-l(10)a. through m., including a child who has been abandoned, and, in that foregoing condition, is “in need of care or supervision” meets the statutory definition of a dependent child.[3] It is a reasonable interpretation of § 12-15-1(10) to require that, in determining whether a child is “in need of care or supervision,” the juvenile court must consider whether the child is receiving adequate care and supervision from those persons legally obligated to care for and/or to supervise the child. The child is entitled to the care or supervision from those persons with the authority to take appropriate actions on behalf of the child, such as, for example, to enroll the child in school, to authorize medical care for the child, and to obtain insurance for the benefit of the child. This interpretation comports with the purposes of the Alabama Juvenile Justice Act, now § 12-15-101 et seq., Ala.Code 1975, among which are to provide children with permanency and to foster family preservation.[4]
*1048 In the present case, the juvenile court concluded, based on ore tenus evidence, that even though dependency had been alleged, the child was not, in fact, a dependent child. “The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.” Hall v. Maz-zone, 486 So.2d 408, 410 (Ala.1986). “The trial court’s judgment in cases where the evidence is heard ore tenus will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.” River Conservancy Co. v. Gulf States Paper Corp., 837 So.2d 801, 806 (Ala.2002).
Although we acknowledge that the juvenile court heard ore tenus evidence at the hearing, we agree with Judge Bryan that no credible evidence supports the juvenile court’s conclusion. The juvenile court apparently believed the father’s testimony that he had been deceived by the mother as to the child’s whereabouts and that she had made the father’s communication and visitation with the child difficult and unworkable at best. Even so, the father’s failure to pursue his right to visit with the child or to provide financially for the child for a period of over three years strongly supports a finding that he had abandoned the child. The father testified at the hearing as follows in response to questions from the petitioners’ attorney:
“Q. Sir, Judge [William K.] Bell told you in the transcript of that hearing in August of 2005 that you would have to enroll in an anger-management class, did he not?
“A. I understand that, ma’am, but I thought it was a temporary hear-
ing so I didn’t know it was mandatory at that time.
“Q. You didn’t understand that that was an order of the court?
“A. It was a temporary hearing.
“Q. Yes, sir. And did you go — excuse me. Did you go to a temporary parenting class, a temporary anger-management class?
“A. I don’t know if there is one, ma’am.
“Q. You thought because it was a temporary hearing you didn’t have to comply?
“A. I didn’t know it was mandatory, but I did when the paper was received.
“Q. Well, sir, after August of 2005 did you take any actions to find out what was going on in your custody hearing in Alabama?
“A. Yes, I had called my ex-wife.
“Q. Did you ever verify with the Circuit Court of Madison County or with Judge William K. Bell, what actions had been taken in your case after you appeared here in August of 2005?
“A. No, I have not.
“Q. You didn’t think it was important?
“A. It’s not that I didn’t think it was important. I didn’t have funds for a lawyer, I didn’t have funds for a plane ticket to come here.
“Q. Did you even pick up the phone, sir? Did you pick up the phone and call?
“A. I didn’t know I could.
[[Image here]]
“Q. Let’s just cut to the chase. Since 2005 how much support have you paid for this child?
*1049 “A. I’ve provided for him when he was with me, but other than that nothing.
“Q. Well, he hasn’t been with you since 2005; is that correct?
“A. Yes, he has, February to March 2005.
“Q. All right. Since March of 2005 your answer would be nothing?
“A. That’s correct.
“Q. And since you were aware in June of 2008 that he was living with the [petitioners] you still didn’t provide any financial support for him; is that correct?
“A. This is correct.
[[Image here]]
“Q. And you say that you have never paid financial support for [the child] because when you [would] call [the mother] she wouldn’t give you a valid address; is that right?
“A. That’s correct.
“Q. But yet, sir, you were able to get Christmas presents to him; is that correct?
“A. Correct.
“Q. At an address that you had in your possession in December of 2007; is that correct?
“A. This is correct.
“Q. And did you ever bother sending a child-support check to that address?
“A. No. I spent the money that I would have sent on gifts for her daughter — I believe it’s her daughter and my son.
“Q. And what did you buy your son?
“A. I bought him various toys.
“Q. And do you think that toys are more important than the shelter and clothing and food that he requires?
“A. No. I wasn’t aware he didn’t have any of that.
“Q. Well, do you understand, sir, that you’re under a responsibility to provide that for him?
“A. I wasn’t ordered by the Court to pay child support.
“Q. I’m talking about morally, sir?
“A. I tried, yes.
“Q. Sir, how many times did you send a child support check to [the mother] or the [petitioners]?
“A. I haven’t sent a check.”
The father had been awarded visitation rights with the child under the pendente lite order, although his visitation with the child was suspended by the divorce judgment until he completed an anger-management program and a parenting class. However, he did not complete those classes until shortly before the hearing in the juvenile court. He did not seek any relief from the divorce court when the mother continually thwarted his requests to talk to the child or when, he said, the mother and members of her family threatened him physically if he came to Alabama to see the child; likewise, he sought no assistance from the divorce court in ascertaining the whereabouts of the child. Furthermore, the father made no effort whatsoever to contribute financially to the child’s support or to assure himself that the child was adequately taken care of, despite the mother’s repeated household moves and evasiveness about the child. The father’s stated excuse for his failure to provide financial support for the child was that he did not know the child had material needs that were not being met and that he thought he was not bound by the pen-dente lite order of the divorce court that ordered him to pay child support. The father simply assumed that the mother was adequately caring for the child, and he *1050 never attempted to assure himself that the child had basic essentials such as food, shelter, clothing, and medical care. The father made no effort to determine who was meeting the child’s needs and abdicated his responsibility to contribute to the financial support of the child.
As a general rule, “[i]n matters concerning child custody and dependency, the trial court’s judgment is presumed correct on appeal and will not be reversed unless plainly and palpably wrong.” Ex parte T.L.L., 597 So.2d 1363, 1364 (Ala.Civ.App.1992). After reviewing the record in this case, we conclude that the juvenile court was plainly and palpably wrong when it found that the child was not dependent and dismissed the case; therefore, the Court of Civil Appeals erred in affirming the juvenile court’s judgment dismissing the case on that basis. We conclude that, at the time the petitioners sought custody of the child and a finding of dependency, the child had been abandoned by both persons legally obligated to care for and/or to supervise him. The mother had allowed the petitioners to assume physical custody of the child and thereafter assumed no responsibility for his care or supervision. The father had not seen the child or provided any financial support for a period of over three years. The child was, therefore, dependent as that term is defined by § 12-15-1(10), Ala.Code 1975.

III. Conclusion

We reverse the judgment of the Court of Civil Appeals and remand the case for that court to remand the case to the juvenile court with instructions for the juvenile court to make a finding of dependency and for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
COBB, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., dissents.

. Effective January 1, 2009, as part of a comprehensive rewrite of the Alabama Juvenile Justice Act, § 12-15-1(10), Ala.Code 1975, where the definition of "dependent child” was found, was amended and renumbered. The definition, as amended, can now be found at § 12-15-102(8).

. Abandonment is defined as follows:
*1047 “A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
§ 26-18-3(1), Ala.Code 1975 (amended and renumbered as § 12-15-301(1), Ala.Code 1975). The language of the current statute is substantially similar.

. The same is true under the current statute, § 12-15-102(8)a., which defines a "dependent child” as follows:
"a. A child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
"5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in subdivision (1) of Section 12-15-301.
[[Image here]]
"8. Who, for any other cause, is in need of the care and protection of the state.”

. Although the petitioners alleged in their petition that the child is dependent, they did not specifically allege that the child was "in need of care or supervision.” They did allege facts that, if true, would fall within some of the alternatives for dependency set forth in subsections a. through m. of § 12-15-1(10). The Court of Civil Appeals has held that such factual allegations, together with the allegation that the child was dependent and that the child’s best interests would be served by awarding custody to the petitioners, are sufficient to invoke the jurisdiction of the juvenile court under the dependency statute. J.W. v. N.K.M., 999 So.2d 526 (Ala.Civ.App.2008). In J.W., the Court of Civil Appeals determined that the allegation that the child was "in need of care or supervision” pursuant to subsection n. of § 12-15-1(10) was implicit in the petitioner’s dependency complaint. We conclude that the same is true in this case — the allegation that the child was in need of care or *1048 supervision was implicit in the petition. See also T.T.T. v. R.H., 999 So.2d 544 (Ala.Civ.App.2008).